**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS W. SHAFFER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 14-309 |
| FAYETTE COUNTY OF | ) |
| PENNSYLVANIA, and | ) |
| AL AMBROSINI, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

**CONTI, Chief District Judge**

### I. Introduction

Plaintiff Thomas W. Shaffer ("plaintiff"), an attorney formerly employed by Fayette County (the "County") as an assistant public defender, filed this civil action against Fayette County Commissioner Al Ambrosini ("Ambrosini") and the County (collectively, "defendants") for allegedly tortious conduct undertaken in connection with the termination of plaintiff's employment. In his operative pleading, plaintiff asserts claims against Ambrosini for the alleged violation of his due process rights and for defamation. Plaintiff also asserts a claim against the County under the Equal Pay Act, 29 U.S.C. §206(d)(1).[1]

Presently pending before the court is defendants' motion for summary judgment on all counts (ECF No. 61). For the reasons that follow, the motion will be granted in part and denied in part.

---

[1] The court has subject-matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §1331. The court exercises jurisdiction over the state law defamation claim pursuant to 28 U.S.C. §1367.

## II. Factual and Procedural Background

Fayette County is a Fourth Class County of the Commonwealth of Pennsylvania. (*See* Defs.' Mot. Dismiss Second Am. Compl. ¶9, ECF No. 31; Pl.'s Resp. to Defs.' Mot. Dismiss Second Am. Compl. ¶ 9, ECF No.35.) Pursuant to the Pennsylvania County Code, the corporate powers of Fayette County are vested in a board of county commissioners. *See* 16 PA. STAT. §203. It is undisputed that, at all times relevant to this lawsuit, the County had a three-member board of commissioners comprised of Vincent Zapatosky ("Zapatosky"), Angela Zimmerlink ("Zimmerlink"), and defendant Ambrosini.

Plaintiff began working as a part-time assistant public defender for the County in January 2004. (DCSMF ¶1, ECF No. 76.)[2] During the course of his employment, plaintiff worked under the supervision of Jeffrey Whiteko ("Whiteko"), the County's Chief Public Defender. (Pl.'s Dep. at 25:25-26:5; Carnicella Dep. at 16:24-17:1.)[3]

Between October 2005 and June 2012, Whiteko issued a number of reprimands or warnings to plaintiff concerning perceived deficiencies in his work performance. (DCSMF ¶¶ 2-12.) In a memorandum dated October 6, 2005, Whiteko informed plaintiff that he had "been unhappy with [plaintiff's] performance for the last several months" and had previously "expressed [his] displeasure," but recent actions in the "last three weeks have warranted this letter." (DCSMF ¶2; Defs.' Ex. D, ECF No. 64-4.) According to Whiteko:

---

[2] Citations to "DCSMF ¶__" refer to defendants' Concise Statement of Material Fact (ECF No. 73), as set forth in the parties' Joint Concise Statement of Material Fact (ECF No. 76). Because plaintiff failed to specifically admit or deny the factual averments in defendants' Concise Statement of Material Fact as required by Local Rule 56(C)(1)(a), defendants' alleged facts will be deemed admitted to the extent they are not "otherwise controverted" by the plaintiff's own Concise Statement of Material Fact. *See* LCvR 56(E).

[3] Portions of plaintiff's deposition are set forth in the record as defendants' Exhibit A (ECF No. 64-1), defendants' Exhibit BBB (ECF No. 75-4), and plaintiff's Exhibit C (ECF No. 71-2). Relevant portions of Dominick Carnicella's deposition are set forth in the record as defendants' Exhibits Q (ECF No. 64-17), R (ECF No. 64-18), and AAA (ECF No. 75-3), and plaintiff's Exhibit D (ECF No. 71-2).

a.  on September 26 and 27, 2005, plaintiff had failed to abide by Whiteko's policy concerning the handling of private criminal matters;

b.  on September 29, 2005, plaintiff contacted the public defender's office from the law library to inform them that he had two separate matters scheduled before two different judges at 2:15 p.m. and 2:45 p.m. respectively, and had not yet appeared in court, which "caused much grief to the office and our office manager, Linda Rossi";

c.  on October 4, 2005, plaintiff was supposed to present a petition in court for the transport of a prisoner, but he had failed to do so; when Ms. Rossi asked about the petition, plaintiff "went to her desk and began to scream at her in the presence of our legal secretary and part time employee."

(*Id.*)  Whiteko admonished plaintiff that, if he "continue[d] to be cavalier" concerning the office scheduling policy or if he was "too busy to maintain both a private and public practice," then he "should part ways" with the public defender's office.  (Defs.' Ex. D at 2.)  Later that same month, plaintiff received written and verbal counseling from Whiteko after failing to appear for a hearing in front of a magisterial district justice due to the fact that he was waiting for a private client.  (DCSMF ¶3; Defs.' Ex. E, ECF No. 64-5.)

On July 19, 2006, Commissioner Zimmerlink informed Whiteko that she had received a complaint about plaintiff swearing at a citizen in the hallway of the courthouse.  Whiteko advised plaintiff about the complaint.  Thereafter, a representative from the County's human resources department spoke to plaintiff, and plaintiff reportedly acknowledged that he had been "wrong." (DCSMF ¶4; Defs.' Ex. F, ECF No. 64-6; Defs.' Ex. G, ECF No. 64-7; Defs.' Ex. H, ECF No. 64-8.)  That same month, Whiteko sent plaintiff a letter concerning the need to have expert witness costs reviewed and approved prior to hiring the expert.  Whiteko cited two instances in which plaintiff had failed to secure the necessary approval prior to hiring experts, which was "creating a serious problem" for other clients in light of the office's limited budget.  (DCSMF ¶5, Defs.' Ex. I, ECF No. 64-9.)

In August 2006, Whiteko sent plaintiff a "last warning" concerning the manner in which he was handling his private and public criminal caseloads. Whiteko reminded plaintiff that, if he scheduled a private criminal hearing with a magistrate or judge, he was expected to help cover public defender cases before that same judicial official. (DCSMF ¶6; Defs.' Ex. J, ECF No. 64-10.)

On July 24, 2007, Whiteko met with plaintiff to discuss plaintiff's failure to appear for scheduled court hearings. Whiteko memorialized the incident in a memorandum to plaintiff, noting:

> This is not the first time I have had to reprimand you for missing schedules[,] being late for court or failing to pick up a missed day. I requested your resignation but after much discussion it was agreed that you will receive one last chance to correct the problems. (A copy of previous complaints are [sic] attached.)
>
> You will receive no other chances.

(DCSMF ¶7; Defs.' Ex. K, ECF No. 64-11.)

The record shows that plaintiff continued to experience problems in 2011 and 2012. In September 2011, Magisterial District Justice Ronald J. Haggerty, Jr.'s office sent an email to Whiteko complaining that plaintiff was continuously late, leaving early before all his hearings and cases were handled, and socializing with police officers instead of working on cases. (DCSMF ¶8, Defs.' Ex. L, ECF No. 64-12.) Magistrate Haggerty wrote another letter in April 2012 complaining that, despite the court's very busy docket, plaintiff was using his time to draft omnibus pre-trial motions on other unrelated cases, which was further slowing down Magistrate Haggerty's docket. (DCSMF ¶9, Defs.' Ex. L.) The following month, plaintiff appeared forty minutes late for a proceeding before Magistrate Haggerty. When asked why he was late, plaintiff reportedly remarked that he had been at lunch, prompting Magistrate Haggerty to lodge another complaint. (DCSMF ¶10; Defs.' Ex. L.)

Plaintiff's employment file documents his difficulties with other judges as well. In January 2012 plaintiff was reportedly scheduled for trial before Judge Leskinen but, instead of showing on time for trial, he went to motion court and then to another judge's courtroom for private pleas; this reportedly prompted a telephone call from the court administrator's office informing the public defender's office that Judge Leskinen was "very irritated with the situation." (Defs.' Ex. L at 2.) Plaintiff was again late to court on May 3, 2012, resulting in Whiteko covering the first three hearings before Judge Capuzzi. (DCSMF ¶11; Defs.' Ex. L.)

On June 5, 2012, Whiteko issued plaintiff a performance counseling form as a "final notice" of his unsatisfactory job performance based on the foregoing incidents occurring between July 2011 and May 2012. Whiteko listed plaintiff's attitude, tardiness, and inefficiency as the reasons that necessitated counseling. (DCSMF ¶12, Defs.' Ex. L.)

On August 30, 2012, plaintiff and Whiteko had a verbal altercation in the public defender's office which allegedly resulted in plaintiff yelling at Whiteko, using profanity, and referring to public defender clients as "scumbags." (DCSMF ¶13.) As a result of this altercation, plaintiff was initially suspended with pay. (*Id.* ¶ 14.) By letter dated October 10, 2012, from Dominick Carnicella, the County's Human Resource Director ("Carnicella"), plaintiff was notified that the suspension would be unpaid. (DCSMF ¶18; Defs.' Ex. O, ECF No. 64-15.) The letter advised plaintiff that

> the County Commissioners have determined that your actions on August 30, 2012 were inappropriate and violated County Policy by creating a disturbance in the workplace, using foul and abusive language and directing disrespectful language toward your supervisor. Due to these violations the County Commissioners have voted to convert your paid suspension to an unpaid suspension effective August 30, 2012 as well as to mandatorily refer you to the Employee Assistance Program (EAP) for an evaluation. This unpaid suspension shall continue through the date of your return back to work.
>
> Your return back to work is contingent upon your successful completion of any evaluation and follow up plan recommended by the EAP program. Failure

to complete the recommended plan shall result in a recommendation for further disciplinary action up to and including the termination of your employment. ...

(Defs.' Ex. O, ECF No. 64-15.)

Pursuant to the EAP referral process, Carnicella completed an informational form, which he sent to the EAP case management staff so that it could be shared with the evaluating therapist. (DCSMF ¶19; Defs.' Ex. P, ECF No. 64-16.)  Under the topic "Expected goals," Carnicella indicated:  "Anger management, appropriate ways to handle stress and performance counseling. Appropriate ways to have discussions w/ supervisors.  Return to work after completion of evaluation & recommended treatment."  (*Id*.)

As part of the EAP process, plaintiff met with counselor Adam Sedlock on at least two occasions for the purpose of determining whether plaintiff had an anger management problem. (DCSMF ¶20.)  The first appointment involved intake information; the second appointment involved Mr. Sedlock's administration of the Minnesota Multiphasic Test to evaluate whether plaintiff exhibited violent behavior.  (*Id*. ¶21; Pl. Dep. at 49:20-51:21, 52:14-53:22.)  After determining that plaintiff did not require treatment for anger management issues, Mr. Sedlock notified Carnicella that plaintiff had completed what was required under the EAP referral and was cleared to return to work.  (DCSMF ¶22; Pl. Dep. at 53:2-54:5; Carnicella Dep. at 40, Feb. 12, 2015, ECF NO. 64-17; Carnicella Cont'd Dep. at 10:15-22, 11:12-15,  Mar. 30, 2015, ECF NO. 64-18.)  Plaintiff returned to work on November 29, 2012.  (DCSMF ¶23.)

On June 27, 2013, plaintiff was involved in an incident with Magistrate Haggerty, which prompted the magistrate judge to lodge complaints with the Public Defender's office and the disciplinary board.  (DCSMF ¶24.)  Magistrate Haggerty's letter to Whiteko stated the following:

This morning Mr. Shaffer was representing a client of the public defender's office in a preliminary hearing.  I ruled on an objection made by the Commonwealth and Mr. Shaffer did not agree with my decision.  He pointed his finger at me in open court and told me that I was not fair and that he was sick of the way that I do

things. Mr. Shaffer then brought up a previous case in which I asked a question of a Commonwealth Witness that was not being represented by the District Attorney's Office. He felt that I assisted in the prosecution of the case and that it would have normally been thrown out. He also told me that if I keep it up that he planned on reporting me to the Judiciary. Mr. Shaffer then pointed to a quote that is displayed in my court room and told me that I should follow the example quote that my father had previously hung in the court room. I warned Mr. Shaffer of his conduct and asked if he had a question that he wanted to ask the witness; after he expressed a few more of his opinions to me in the open court we were able to resume the case.

Mr. Shaffer was completely unprofessional and his actions were an embarrassment to the court. The incident was witnessed by ADA Mark Brooks, ADA Megan Miklusak, Chief James Capitos, Capt. Steven Shaffer, Officers Ruff, Hominsky, Patton and several other citizens.

ADA Brooks and Chief Capitos both made statements that they have never seen such disrespect in a court room.

Mr. Shaffer later wanted to meet with me privately in my office. He apologized and then expressed his displeasure with me regarding a letter that I had written in the past regarding his conduct. He also told me that I was pro-prosecution and all of the defense attorneys know it. I told Mr. Shaffer that I intended on writing another letter regarding his latest actions and he then threatened that he would turn me in to the Judiciary for review.

Mr. Shaffer's conduct is an embarrassment to our system and a disservice to the clients that he represents.

I hope he will be dealt with accordingly. If you have any further questions I urge you to please call any of the above listed witnesses or myself. ...

(Defs.' Ex. U, ECF No. 64-21.)

On July 2, 2013, plaintiff was suspended without pay pending Carnicella's investigation of the June 27, 2013 incident. (DCSMF ¶25.) In the course of his investigation, Carnicella spoke with Magistrate Haggerty, Assistant District Attorney Brooks, Assistant District Attorney Miklusak, and Chief Capitos, all of whom witnessed the incident. (DCSMF ¶34; Defs.' Ex. DD-GG, ECF Nos. 64-30 through 64-33.)

By letter dated Tuesday, July 16, 2013, Carnicella notified plaintiff that: (a) based on information obtained through its internal investigation, the County had determined that plaintiff's

conduct before Magistrate Haggerty potentially violated county policy, (b) the violations could

constitute grounds for disciplinary action up to and including dismissal, and (c) plaintiff would

have an opportunity to respond to the allegations of misconduct at a meeting scheduled for that

Thursday, July 18, 2013.  (DCSMF ¶¶ 26 and 28; Defs.' Ex. Y, ECF No. 64-25.)  The letter set

forth the following allegations stemming from the June 27, 2013 incident:

1. You pointed your finger at Magistrate Haggerty while screaming "I am tired of your crap."

2. "I am turning you into the judicial review board."

3. "You are corrupt."

4. "You are biased toward the prosecution."

5. You then pointed to a sign on MDJ Haggerty's wall stating "you should follow the example of the quote your father hung in this Courtroom."

(Defs.' Ex. Y, ECF No. 64-25.)

Plaintiff spoke with Carnicella on the afternoon of Wednesday, July 17, 2013, and

notified him that he would be leaving for a one-week vacation on Friday, July 19.  (Pl.'s Dep. at

92:3-5.)  Carnicella told plaintiff that he could come in the following day to discuss the incident

with Magistrate Haggerty, and plaintiff agreed to do so.  (*Id*. at 92:6-8; PCSMF ¶¶ 12-13.) [4]

At the July 18, 2013 meeting, plaintiff and Carnicella discussed the June 27, 2013

incident at Magistrate Haggerty's office and the allegations set forth in Carnicella's July 16,

2013 letter.  (Defs.' Ex. Z, ECF No. 64-26.)  Plaintiff denied certain aspects of his alleged

misconduct and provided Carnicella three affidavits from individuals who had been present

during the incident, along with their contact information.  (DCSMF ¶30; Defs.' Ex. Z, ECF No.

64-26; Defs.' Ex. AA, ECF No. 64-27; Defs.' Ex. BB, ECF No. 64-28; Defs.' Ex. CC, ECF No.

---

[4] Citations to "PCSMF ¶__" refer to plaintiff's Concise Statement of Material Fact (ECF No. 71) and defendants' responses thereto (ECF No. 74), as set forth in the parties' Joint Concise Statement of Material Fact (ECF No. 76).

64-29.)  Following his meeting with Carnicella, plaintiff submitted one additional affidavit concerning the June 27, 2013 incident.  (DCSMF ¶33.)  Carnicella ultimately construed the affidavits to be the witnesses' full statements on the matter and did not contact them further concerning their knowledge of the June 27, 2013 incident.  (DCSMF ¶30.)  Plaintiff contends that he requested assistance from Carnicella in obtaining the contact information for additional witnesses and asked that the record be kept open pending an opportunity to secure this information in light of his upcoming vacation.  (Pl. Dep. at 104:18-108:18.)  Despite plaintiff's understanding that Carnicella would do so, Carnicella rendered his recommendation for plaintiff's termination just one week later without the benefit of any additional information.  (Pl. Dep. at 104:18-105:4; 105:22-106:6, 107:15-19, 108:5-18; Defs.' Ex. V, ECF No. 64-22; Defs.' Ex. W, ECF No. 64-23.)

On July 25, 2013, Carnicella sent identical memoranda to Zapatosky and Ambrosini regarding his "[Assistant Public Defender] Inappropriate Comments Investigation."  (Defs.' Ex. V, ECF No. 64-22; Defs.' Ex. W, ECF No. 64-23.)  In the memoranda, Carnicella outlined the various remarks that plaintiff had allegedly made to Magistrate Haggerty, plaintiff's responses to the allegations, and a summary of the accounts given by some of the witnesses who were present at the time.  (*Id*.)  Carnicella noted that:

> Mr. Whiteko is recommending Termination of Mr. Shaffer's employment for the above comments.  Although Mr. Shaffer has the right and responsibility to request a <u>confidential</u> investigation by the Judicial Conduct Board if he believes a judge has violated the Court rules of Conduct or to file an appeal on the case if he feels the MDJ erred, which would be reviewed by the higher Court, Mr. Whiteko feels these comments made during the hearing were inappropriate for a hearing, disrespectful to MDJ Haggerty and the Courts and ... didn't professionally represent the County or the Public Defender's Office in this matter.
>
> Mr. Whiteko believes that the ongoing need to counsel and discipline Mr. Shaffer since 2005 and most recently issuing him a Final Notice on June 5, 2012 for poor attitude and tardiness as well as a Last Chance Suspension Without Pay with required Employee Assistance Program evaluation and counseling on

October 10, 2012, for the screaming and cursing outburst in the Public Defender's office, demonstrates a pattern that can no longer be tolerated.

(*Id.*) Carnicella advised Ambrosini and Zapatosky that:

> HR concurs with Mr. Whitko's [sic] recommendation. Mr. Shaffer is employed at will and has been provided multiple opportunities to correct his behavior. Per County policy, making disrespectful comments is a violation for which an employee shall be subject to disciplinary action up to and including termination of employment. All of the proper steps have been taken in this matter. ...

(*Id.*)

Based upon the results of Carnicella's investigation, both Ambrosini and Zapotosky voted to terminate plaintiff's employment.[5] (DCSMF ¶36; Defs.' Ex. V, ECF No. 64-22; Defs.' Ex W, ECF No. 64-23.) Plaintiff was notified of his termination by letter dated July 29, 2013. (DCSMF ¶37; Defs.' Ex. JJ, ECF No. 64-36.)

At some point after the incident with Magistrate Haggerty but prior to his termination, plaintiff asked Guy Peter Cordaro ("Cordaro") and State Representative Timothy Mahoney ("Mahoney") to speak to Ambrosini on his behalf. (DCSMF ¶¶ 38, 42.) Cordaro understood that plaintiff wanted him to "put in a good word for him" with Ambrosini because plaintiff was "concern[ed] about his job" due to "some sort of incident at a hearing." (Cordaro Dep. at 11:20-23, 12:4-6, 12:22-25.)[6] Cordaro asked Ambrosini, "[I]s there anything you can do for Tom, I know he really needs to keep his job at the county because it depends on health insurance for his son?" (*Id.* at 12:18-21.) According to Cordaro, Ambrosi indicated he "went to bat" for plaintiff, but he "believe[d] Mr. Shaffer needs anger management classes." (*Id.* at 13:7-9.) When questioned further about this conversation at his deposition, Cordaro could not recall the specifics of Ambrosini's remarks, but he thought that Ambrosini indicated either that plaintiff

---

[5] For reasons that are not clear, Commissioner Zimmerlink did not vote in the matter.
[6] Portions of Cordaro's deposition are set forth in the record at defendants' Exhibit LL (ECF No. 64-38) and plaintiff's Exhibit A (ECF No. 71-1).

needed to attend anger management classes or had already done so. (*Id.* at 20:1-13, 22:2-4, 23:5-7.) After speaking with Ambrosini, Coradaro reported the information back to plaintiff. (*Id.* at 13:20-23.) Cordaro did not speak to anyone else about his conversation with Ambrosini except for his wife, Linda Cordaro, who is presently a judge on the Fayette County Court of Common Pleas. (*Id.* at 13:22-14:2, 21:12-18.) Cordaro stated that Ambrosini's remarks did not affect his view of plaintiff in any way. (*Id.* at 14:19-15:1.)

Mahoney also made contact with Ambrosini (and with Zapatosky) on plaintiff's behalf. (Mahoney Dep. at 13:6-9).[7] Mahoney understood that plaintiff had been suspended due to "a misunderstanding with a local magistrate." (*Id.* at 13:10-14.) Mahoney asked Ambrosini "what was going on with Tommy and his boss downstairs." (*Id.* at 14:10-12.) Ambrosini replied that there was "a mix up between the two of them ... with the magistrate," and that "there wouldn't be a conclusion until Tommy went to anger management classes." (*Id.* at 14:12-17.) Upon speaking with Zapatoski, Mahoney received the "same assurance that nothing would go on" and plaintiff "would have his job," but he "had to complete the anger management course." (*Id.* at 15:15-16:2.) Mahoney perceived that both Ambrosini and Zapatosky "thought that [plaintiff was] in anger management, they were waiting for the anger management to be over and it would be rectified." (*Id.* at 25:9-13.) Following these conversations, Mahoney reported back to plaintiff and "reassured him that [Mahoney did not] think[plaintiff was] going to lose his job and that they had said as long as he went to the anger management classes that things should work out." (*Id.* at 17:11-15.) When Mahoney imparted this information, plaintiff was "just thankful that [Mahoney] talked to them about it." (*Id.* at 17:18-22.) Unlike Cordaro, Mahoney testified

---

[7] Portions of Mahoney's deposition are set forth in the record at defendants' Exhibit KK (ECF No. 64-37) and plaintiff's Exhibit B (ECF No. 71-1).

that the information he learned about plaintiff did affect his view of plaintiff in a negative way because "attorneys are supposed to have level heads." (*Id.* at 22:8-22.)

Following his termination, plaintiff commenced this lawsuit. After extensive pretrial proceedings, plaintiff filed his Third Amended Complaint ("TAC," ECF No. 44), the operative pleading in this matter. Counts I (violation of plaintiff's federal due process rights) and II (defamation of character) of the TAC assert claims against Ambrosini in his personal capacity. Count III of the TAC asserts a claim against the County for alleged violation of the Equal Pay Act, 29 U.S.C. §206(d)(1).

Defendants filed the instant motion (ECF No. 61) on July 18, 2015, seeking summary judgment on all three counts. The parties submitted their respective materials in support of, and in opposition to, the pending motion. (ECF Nos. 62-64, 70-76.) As a result, the issues are sufficiently joined and ripe for resolution.

### III. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the nonmoving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.2007); *UPMC Health System v. Metropolitan Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004). The burden then shifts to the nonmovant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v. Borough of West Chester, Pa*., 891 F.2d 458, 460–61 (3d Cir. 1989) (the nonmovant must present affirmative evidence – more than a scintilla, but less than a preponderance – which supports each element of his claim to defeat a properly presented

motion for summary judgment).  The nonmoving party must go beyond the pleadings and show

specific facts by affidavit or by information contained in the filed documents (*i.e.*, depositions,

answers to interrogatories and admissions) to meet his burden of proving elements essential to

his claim. *Celotex*, 477 U.S. at 322; *see Saldana v. Kmart Corp*., 260 F.3d 228, 232 (3d Cir.

2001).  The nonmoving party "'must present more than just bare assertions, conclusory

allegations or suspicions to show the existence of a genuine issue.'"  *Garcia v. Kimmell*, 381 F.

App'x 211, 213 (3d Cir.2010) (quoting *Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 594 (3d

Cir.2005)).

When considering a motion for summary judgment, the court is not permitted to weigh

the evidence or to make credibility determinations, but is limited to deciding whether there are

any disputed issues and, if there are, whether they are both genuine and material. *Anderson v.

Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  The court must consider the evidence, and all

reasonable inferences which may be drawn from it, in the light most favorable to the nonmoving

party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *see El v.

SEPTA*, 479 U.S. 232, 238 (3d Cir.2007).

### IV. Discussion

#### A.  *Plaintiff's Claim Under 42 U.S.C. §1983 (Count I)*

In Count I of the TAC, plaintiff asserts a claim against Ambrosini in his personal capacity

under 42 U.S.C. §1983.  This statute provides a private right of action as against:  "[e]very

person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ...

subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws…."  42 U.S.C. §1983.  "[T]o state a claim

under section 1983 a plaintiff 'must allege the violation of a right secured by the Constitution

and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Lomax v. U.S. Senate Armed Forces Serv. Comm.*, 454 F. App'x 93, 95 (3d Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Because there is no dispute that Ambrosini was acting under color of state law, the court's analysis will focus on whether plaintiff adduced evidence of a constitutional violation.

Here, plaintiff claims that Ambrosini violated his rights under the Fourteenth Amendment to the U.S. Constitution, which prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. To successfully state a procedural due process violation, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir.2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)); *see Emigh v. Steffee,* Civil Action No. 08–1726, 2009 WL 1472916, at *10 (W.D. Pa. May 27, 2009).

With respect to the first element of his claim, plaintiff alleges that Ambrosini deprived him of a protected liberty interest by stating that he had attended, or needed to attend, an anger management classes. "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest," *Hill,* 455 F.3d at 236 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)), a standard commonly referred to as the "stigma-plus" test. "'In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest.'" *Id.* (quoting *Codd v. Velger*, 429 U.S.

624, 628 (1977)).  In such a scenario, "the 'creation and dissemination of a false and defamatory impression is the stigma, and the termination is the plus.  When such a deprivation occurs, the employee is entitled to a name-clearing hearing.'" *Brown v. Montgomery Cty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (quoting *Hill,* 455 F.3d at 236) (additional internal quotation marks omitted).

Defendants argue that plaintiff's stigma-plus claim fails for several reasons.  First, they contend that Ambrosini's alleged statements do not provide the necessary stigma.  Second, they argue that even if stigma is established, plaintiff's due process claim cannot proceed against Ambrosini personally, because Ambrosini did not terminate plaintiff from his job.  Third, defendants maintain that the County's investigation and termination proceedings provided plaintiff all the due process to which he was entitled.

Plaintiff contends that summary judgment should be denied because the evidence in this case shows that plaintiff was terminated without being afforded his due process rights of a name-clearing hearing.  More specifically, plaintiff argues that he was never made aware of Ambrosini's statements about plaintiff attending anger management classes until after his meeting with Carnicella had already occurred; therefore, he was never given an opportunity to address "this fabricated ground for termination."  (Pl.'s Br. Opp. Mot. Summ. J. at 14, ECF No. 72.)

In reply, defendants argue that plaintiff's request for a name-clearing hearing is misplaced.  While defendants agree that the point of a name-clearing hearing is to "allow[ ] Plaintiff an opportunity to refute the reason for his termination," (Defs.' Reply Br. in Supp. Mot. Summ. J. at 8, ECF No. 73), they maintain that plaintiff's termination stemmed from the June 27, 2013 incident with Magistrate Haggerty and, as to that matter, plaintiff received adequate due process.

Upon careful consideration of the parties' respective positions and the evidence in this case, the court finds that defendants' argument is well taken. In the public employment context, a stigma-plus due process claim "is premised on an alleged harm to a public employee's liberty interest in her reputation caused by her public employer's adverse employment action." *Berkery v. Wissahickon Sch. Bd.*, 99 F. Supp. 3d 563, 572 (E.D. Pa. 2015), *aff'd sub nom. Berkery v. Wissahickon Sch. Dist. Bd. of Directors*, No. 15-1845, 2015 WL 5829901, --- F. App'x --- (3d Cir. Oct. 7, 2015) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 235 (3d Cir.2006)) (emphasis added). Accordingly, "[t]o establish entitlement to a 'name-clearing hearing,' the aggrieved employee must show: 1) the public employer's reasons for the discharge stigmatized the employee by seriously damaging his standing and association in the community or by foreclosing employment opportunities that may otherwise have been available; 2) the public employer made the reason or reasons public;[ ] and 3) the employee denied the charges that led to the employee's firing." *Bogardus v. Maloney,* No. Civ. A. 03-1173, 2004 WL 2091477, at *3 (E.D. Pa. Sept. 16, 2004) (emphasis supplied) (internal footnoted omitted)(citing *Gibson v. Caruthersville School Dist. No. 8*, 336 F.3d 768, 773 (8th Cir.2003)). In this case, however, plaintiff's due process claim is not premised on reputational harm stemming from the County's adverse employment action or its stated reasons for the termination. Here, the undisputed evidence establishes that plaintiff was terminated for making disrespectful comments to Magistrate Haggerty in the course of the June 27, 2013 incident. Notably, plaintiff did not identify any false statements on the part of Ambrosini concerning the June 27, 2013 incident that could have stigmatized him for purposes of a stigma-plus claim.

Instead, plaintiff attempts to state a stigma-plus claim by positing that Ambrosini damaged his reputation when he made stigmatizing references to plaintiff attending anger

management classes; however, this theory fails to demonstrate an actionable due process violation. This court previously observed that "there must be a sufficient causal connection between the allegedly stigmatizing statements, and the loss of the constitutionally protected right or status in order to qualify for relief under the stigma-plus test." *Kahan v. Slippery Rock Univ. of Pa.,* 50 F. Supp. 3d 667, 711 (W.D. Pa. 2014) (citing *D&D Assoc., Inc. v. Bd. of Educ. of North Plainfield,* 552 F. App'x 110, 114 (3d Cir. 2014)); *see Sullivan v. State of New Jersey, Div. of Gaming Enforcement,* 602 F. Supp. 1216,  1222 (D.N.J. 1985) (noting that the stigma-plus cases "hold that a liberty interest is implicated if the defamation, in addition to injuring reputation, *also causes the loss of some legally protected right or status*") (emphasis supplied). Assuming that plaintiff's discharge is the relevant "loss" or "plus" factor, the facts of record do not support a causal connection between the allegedly stigmatizing statements and the alleged "plus." As noted, when the evidence of record is fairly construed in the light most favorable to plaintiff, there can be no genuine dispute about the fact that plaintiff was terminated not because of Ambrosini's misperception that plaintiff had attended (or was attending) anger management classes, but because plaintiff had made disrespectful comments to Magistrate Haggerty during the June 27, 2013 incident. Thus, the evidence here does not support a finding that the plaintiff's loss of employment was the result of Ambrosini's stigmatizing statements. *See Stehney v. Perry,* 806, 821 (D.N.J. 1995) (noting that, to show a liberty interest under a stigma-plus theory, a plaintiff must show (among other things) that "the government changed [his] employment status" and "the change occurred *as a result of derogatory allegations* that created a stigma on the plaintiff")(citing *Siegert v. Gilley,* 500 U.S. 226, 233-34 (1991)) (emphasis added), *aff'd,* 101 F.3d 925 (3d Cir. 1996).

Assuming that plaintiff is basing his stigma-plus claim on a different "plus" factor, *e.g.,* the loss of future employment, his claim is deficient for failure to demonstrate the requisite harm. "Although the deprivation of the 'liberty to pursue a calling or occupation' or to 'earn a living' have been deemed sufficient to satisfy the plus prong, a generalized 'possible loss of future employment opportunities,' and 'financial harm' are insufficient to support a reputation-based due process claim." *Kahan,* 50 F. Supp. 3d at 711 (citing *Simpson v. Nicklas*, 500 F. App'x 185, 188 (3d Cir.2012) (citing *Clark v. Twp. of Falls*, 890 F.2d 611, 620 (3d Cir. 1989), and *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir.1987)); *see Thomas v. Independence Twp.*, 463 F.3d 285, 297 (3d Cir. 2006); *see also Hill v. Borough of Kutztown*, 455 F.3d at 225, 232–33 (3d Cir. 2006); *Arneault v. O'Toole*, 513 F. App'x 195, 198–99 (3d Cir.2013) (loss of possible business prospects by being required to disclose an unfavorable fact on future applications does not satisfy the plus prong)). Here, plaintiff did not show that he has been shut out of the legal profession; at most, he adduced evidence only of a generalized threat of lost future employment opportunities. There is insufficient evidence of record to support an actionable stigma-plus claim.

Based upon the unique facts of this case, it is difficult to see what purpose a name-clearing hearing would serve. In *Codd v. Velger*, 429 U.S. 624 (1977), the Supreme Court observed that, "if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." *Id*. at 627. In this case, there is presently no apparent factual dispute between the County and plaintiff concerning plaintiff's attendance at, or need for, anger management classes. The evidence does not support a finding that Ambrosini's allegedly stigmatizing remarks had a "significant bearing" on plaintiff's reputation. There is no evidence to suggest that Ambrosini made remarks about plaintiff

attending anger management classes to anyone other than Cordaro and Mahoney, and Cordaro expressly denied that the remarks affected his view of plaintiff. The lack of a wider audience relates to the fact that Ambrosini spoke to Cordaro and Mahoney about plaintiff's employment situation <u>only</u> after plaintiff had specifically requested that Coradaro and Mahoney speak to Ambrosini on his behalf. In any event, however, there is no dispute that both Cordaro and Mahoney personally reported the substance of their conversations with Ambrosini to plaintiff and, therefore, to the extent any false and stigmatizing information was imparted by Ambrosini, plaintiff had an ample opportunity to correct such misinformation at the time it was reported by Cordaro and Mahoney.

Based upon all the foregoing considerations, the court concludes that plaintiff's due process claim is insufficient as a matter of law. Accordingly, the defendants' motion for summary judgment will be granted with respect to Count I of the TAC.

### B. Plaintiff's Claim Under the Equal Pay Act (Count III)

In Count III of the TAC, plaintiff asserts a claim against the County for alleged violations of the Equal Pay Act ("EPA" or the "Act"), 29 U.S.C. §206(d). The Act provides that:

> [n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1) (West).

Plaintiff's claim under the EPA is evaluated according to a "two-step burden-shifting paradigm." *Johnson v. Fed. Express Corp.*, 604 F. App'x 183, 187 (3d Cir. 2015), *reh'g denied* (Apr. 13, 2015). "The plaintiff must first establish a prima facie case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). In determining whether two jobs involve equal work, the court must first determine "whether 'a significant portion of the two jobs is identical.'" *Johnson,* 604 F. App'x at 187 (quoting *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir.1985)). "'The inquiry then turns to whether ... differing or additional tasks make the work substantially different.'" *Id*. (quoting *Brobst,* 761 F.2d at 156) (ellipsis in the original).

"If the plaintiff establishes her prima facie case, '[t]he burden of *persuasion* then shifts to the employer to demonstrate the applicability of one of the four affirmative defenses specified in the [EPA],' which include '(i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex.'" *Johnson,* 604 F. App'x at 187 (quoting *Stanziale*, 200 F.3d at 107 & n. 6 (emphasis in original)) (alterations in the original). In order to prevail at the summary judgment stage on the basis of an affirmative defense, the employer must prove its defense "'so clearly that no rational jury could find to the contrary.'" *Id*. at 187-88 (quoting *Stanziale*, 200 F.3d at 107 (internal quotation marks omitted)).

In this case, plaintiff's EPA claim is premised on the fact that, during the years 2012 and 2013, he was paid less than Linda Cordaro ("Attorney Cordaro"), then an assistant district attorney for Fayette County serving as Child Abuse Prosecutor.[8] (*See* TAC ¶¶ 38-41.) It is

---

[8] The Hon. Linda Cordaro now serves as a judge on the Fayette County Court of Common Pleas.

undisputed that, during the time period in question, Attorney Cordaro was paid $32,896.50, while plaintiff earned a salary of $25,896.00. (PCSMF ¶23.) It is also undisputed that the County's Salary Board[9] sets pay scales for all county employees, both professional and nonprofessional. (*Id.*) Plaintiff complained about this discrepancy during a 2012 meeting of the Salary Board (PCSMF ¶23), but he maintains that no action was ever taken by the County to address the disparity.

Defendants contend, and this court agrees, that plaintiff's comparator evidence is insufficient as a matter of law to establish a prima facie violation of the EPA. The evidence shows that, based upon pay studies performed by the County's human resources department in 2007, the County "revamped" the pay scales of both union and nonunion employees "according to class, tenure, longevity and things of that nature." (Lally Dep. at 10:10-25.)[10] Following this process, the positions of Assistant Public Defender and Assistant District Attorney were both classified as Pay Grade 9 non-supervisory positions. (DCSMF ¶¶ 52-53.) During a Salary Board meeting on March 28, 2012, however, the Fayette County District Attorney, Jack Heneks, moved to create the position of Child Abuse Prosecutor Assistant District Attorney, and the Salary Board unanimously agreed. (DCSMF ¶¶ 55, 58; Defs.' Ex. SS at 6, ECF No. 64-45.) Minutes from the meeting reflect that District Attorney Heneks reported "Linda has been doing the position ... for the last 2 years and has not been receiving the compensation for the work," and the funding for the position was "in his budget." (Defs.' Ex. SS at 6.) The position of Child Abuse Prosecutor is one step below that of Administrative Assistant Attorney on the non-union ADA Scale, making it a Pay Grade 10 supervisory position. (DCSMF ¶¶ 55, 60.) Once

---

[9]The Salary Board is comprised of the three County Commissioners and the County Controller. (DCSMF ¶48.) *See also* PA. STAT. §1622 (West).

[10] Portions of Sean Lally's deposition are set forth in the record as defendants' Exhibit NN (ECF No. 64-40) and plaintiff's Exhibit E (ECF No. 71-2).

Attorney Cordaro filled the position of Child Abuse Prosecutor, she began earning a salary of $32,584.00. (DCSMF ¶59.)

Although plaintiff argues that Cordaro and he performed "equal work" in their respective positions as Assistant Public Defender and Child Abuse Prosecutor, the record does not support this conclusion. As noted above, "equal work" involves "work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale,* 200 F.3d at 107. Here, plaintiff alleged in the TAC that both he and Attorney Cordaro handled magisterial cases on a weekly basis, prepared and tried criminal cases, negotiated plea deals, presented pleas and sentencings, and handled motions, pretrial conferences, and the like. (TAC ¶41.) Plaintiff failed to present evidence to support these allegations[11] but, even if they are accepted at face value, this would not end the court's inquiry. Assuming that "'a significant portion of the two jobs is identical,'" *Johnson,* 604 F. App'x at 187 (quoting *Brobst,* 761 F.2d at 156), the court must still consider "'whether ... differing or additional tasks make the work substantially different.'" *Id.* (quoting *Brobst,* 761 F.2d at 156) (ellipsis in the original).

Based upon the uncontroverted facts of record, this court concludes that plaintiff's job as an assistant public defender differed in important respects from Attorney Cordaro's job as Child Abuse Prosecutor such that no reasonable jury could conclude that plaintiff and Attorney Cordaro were paid disparately for substantially "equal work." Under Pennsylvania law, assistant public defenders serve at the pleasure of the Chief Public Defender, while assistant district attorneys serve at the pleasure of the District Attorney. *See* 16 PA. STAT. §3450(b) ("Appointees to county offices or positions other than to elected offices shall be subject to removal at the pleasure of the appointing power, except as otherwise provided by law…."). As the court's

---

[11] At the summary judgment stage, a nonmoving plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) (citing former Fed. R. Civ. P. 56(e)).

discussion of background facts demonstrates, each office operates in accordance with its own policies and budgetary constraints. Within Fayette County, as is commonly the case, the District Attorney's office handles virtually all the criminal prosecutions from the preliminary hearing stage forward, whereas the public defender's office handles only that portion of the criminal matters that do not involve privately retained counsel or *pro se* defendants. (Jin Dep. at 29:17-25.)[12] Within the office of the District Attorney, assistant prosecutors might be called upon to handle a variety of cases at the preliminary hearing stage, but once a case is bound over for proceedings in the Court of Common Pleas, office policy requires that a particular type of case, such as a drug case or a child abuse case, be assigned to the assistant district attorney specializing in that area. (DCSMF ¶¶ 65-66.) Consequently, Attorney Cordaro's job required her to handle the majority of child abuse cases that were prosecuted by the District Attorney's office, whereas plaintiff's position involved a more varied and nonspecialized caseload. (DCSMF ¶¶ 61, 66.)

These facts demonstrate that plaintiff and Attorney Cordaro labored under substantially different working conditions. Plaintiff attempts to prove otherwise by citing the deposition testimony of Assistant District Attorney Michelle Kelly, but his efforts in this regard consist of nothing more than conclusory assertions that mischaracterize Kelly's testimony or are otherwise unsupported by the record. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 17, ECF No. 72.) Accordingly, insofar as similarity of working conditions is concerned, plaintiff did not point to evidence in the record that demonstrates the existence of a genuine issue of material fact.

In addition, plaintiff failed to demonstrate that Cordaro's job and his job required substantially equal skill. As discussed, Attorney Cordaro specialized in child abuse cases and was assigned a higher concentration of those matters than her fellow prosecutors. (*Id.* ¶66.)

---

[12] Portions of Phyllis Jin's deposition are set forth in the record as defendants' Exhibit MM (ECF No. 64-39.)

There can be no dispute that, because those cases involve crimes perpetrated against children, they are often emotionally difficult to handle. (*Id.* ¶72.) In addition, those cases require the prosecutor to have an understanding of how to effectively interview child victims and witnesses without tainting their testimony, given the disparities that can exist among children relative to their ages and their abilities to accurately articulate information. (*Id.* ¶70.) Ambrosini testified that the position of Child Abuse Prosecutor was much needed in the County (*see* DCSMF ¶67), and Attorney Cordaro was appointed because she possessed the skills required of the position. (*Id.* ¶73.) This conclusion is buttressed by the fact that Attorney Cordaro had reportedly been performing the job for two years prior to her appointment. (Defs.' Ex. SS at 6.) Although plaintiff insists that his skills as a lawyer were generally equal or superior to those of Attorney Cordaro, this assertion, even if true,[13] misses the point. The relevant inquiry is not whether plaintiff was a better or more experienced lawyer, but whether his job was substantially equal to Attorney Cordaro's in terms of the particular skills required. The evidence in this case shows it was not. While plaintiff posits that he has defended numerous child abuse cases over the course of his career, there is no evidence to suggest that his position as an assistant public defender required him to interact with children in the same manner, and with the same frequency, as was required of the Child Abuse Prosecutor. Accordingly, plaintiff did not show that Attorney Cordaro and he performed work that required substantially similar skills.

In addition, the evidence shows that Attorney Cordaro's position involved tasks and responsibilities that were substantially different from those required of an assistant public

---

[13] Plaintiff posits that, because he has "tried twice as many cases" as Attorney Cordaro, it can fairly be inferred that "he has done a vast amount more sexual assault type cases than Comparator Cordaro." (Br. Opp. Mot. Summ. J. at 18, ECF No. 72.) Plaintiff represents that, in one particular case, he amassed over 1300 hours of billed time which, he claims, is "vast[ly] more hours expended than all other cases combined of Comparator Cordaro." (*Id.*) Aside from being irrelevant, these self-serving assertions are unaccompanied by any citations to evidence in the record. Accordingly, they provide no meaningful support for plaintiff's EPA claim.

defender.  As a general matter, prosecutors and public defenders have fundamentally different roles in the criminal justice system; unlike a prosecutor, who represents the state's or the public's interests, a public defender is essentially "state paid private counsel, assigned the responsibility of protecting the interests and defending the rights of a client." *Brown v. Joseph,* 463 F.2d 1046, 1048 (3d Cir. 1972).  In Fayette County, as in other jurisdictions, prosecutors may be called upon to render legal advice to law enforcement officers during the precharging phase of a case concerning matters such as the sufficiency of a search warrant or the proper drafting of a criminal complaint.  (DSFMF ¶62.)  Plaintiff, by contrast, was not subject to these job responsibilities, since assistant public defenders are assigned cases only after charges have been filed.  (*Id.* ¶64.)  The evidence points to Attorney Coradaro's position as Child Abuse Prosecutor as  having carried supervisory responsibilities,[14] whereas plaintiff's position did not.  (*See* DCSMF ¶¶ 53, 60.)  Finally, as previously noted, Attorney Cordaro's job required her to handle a higher concentration of child victim crimes than plaintiff was required to handle in his capacity as an assistant public defender. Given these substantial differences in the comparative job responsibilities of the Assistant Public Defender position and the Child Abuse Prosecutor position, plaintiff cannot establish a prima face claim under the EPA.[15]

---

[14] This court is mindful that, insofar as Attorney Cordaro's supervisory responsibilities are concerned, the contents of a job description are not necessarily controlling.  *See Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 155 (3d Cir. 1985) ("As our opinions show, the relevant issue is not the name under which the position was classified but what was actually done.).  Here, however, the record is devoid of any probative evidence concerning Attorney Cordaro's supervisory responsibilities beyond the job description for her position.  Plaintiff attempts to cast doubt on this point by citing the testimony of Assistant District Attorney Michelle Kelly; however, Ms. Kelly merely testified that she did not understand her *own* job position (i.e., Senior Assistant District Attorney) to carry any supervisory responsibilities.  (*See* Kelly Dep. at 43:23-44:11, ECF No. 71-2.)  Such evidence has no probative value as it relates to the supervisory responsibilities of Attorney Cordaro.  Plaintiff also posits that, "because Comparator Cordaro was the sole ADA who was given the title Sexual Assault Prosecutor and no one worked under her or at her direction, ...she never supervised anyone and the title is just that – a title whereby discrimination is prohibited under the Equal Pay Act." (Pl.'s Br. Opp. Mot. Summ. J. at 19, ECF No. 72.)  However, this assertion is mere conjecture unsupported by any evidence in the record.

[15] Once again, plaintiff's proffer with respect to this prima facie element is insufficient to demonstrate the existence of a genuinely disputed issue of material fact. In attempting to establish similarities between his own work and

Even if plaintiff had established a prima facie case, however, the court would still conclude that summary judgment is appropriate because the unrebutted evidence shows that Attorney Cordaro's pay level was determined through considerations other than gender. As discussed, Cordaro's position as Child Abuse Prosecutor was a Grade 10, supervisory position, as opposed to plaintiff's Grade 9, nonsupervisory position. The evidence shows that the Child Abuse Prosecutor position was created upon the specific request of the District Attorney, and with approval of the Salary Board, based on a perceived need for the position. Following Attorney Cordaro's resignation from that job, a male attorney was appointed to replace her. (DCSMF ¶75.) In short, the evidence shows that the Salary Board assigned the pay scale for the Child Abuse Prosecutor position based upon factors other than gender, and no reasonable jury could conclude otherwise.[16] Summary judgment will therefore be entered in favor of the County relative to the EPA claim in Count III.

### C. *Plaintiff's Claim for Defamation Under Pennsylvania Law (Count II)*

After judgment is entered as set forth above, only one claim remains, namely plaintiff's state law claim for alleged defamation of character, which is set forth at Count II of the TAC (ECF No. 44). A district court may decline to exercise supplemental jurisdiction where the federal claims are no longer viable. 28 U.S.C. § 1367(c)(3); *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 135 (3d Cir. 2013); *see Tully v. Mott*, 540 F.2d 187, 196 (3d Cir.1976) ("If it appears that the federal claim [...] could be disposed of on a motion for summary judgment under F.R. Civ. P. 56, then the court should ordinarily refrain from exercising

---

Attorney Cordaro's, plaintiff mischaracterizes Kelly's testimony and cites to portions of her testimony that are not in the record. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 18, ECF No. 72.)

[16] Plaintiff cites the deposition testimony of Sean Lally for the proposition that the "Salary Board is nothing but political patronage," and [p]eople in the know get raises." (Pl.'s Br. Opp. Mot. Summ. J. at 72 (citing Lally Dep. at 24-25).) Even if these assertions are credited, they do not advance plaintiff's EPA claim; on the contrary, they demonstrate, if anything, that the comparative pay disparities were based on non-gender-related considerations.

jurisdiction in the absence of extraordinary circumstances.").  Whether to exercise supplemental

jurisdiction is a decision that is "committed to the sound discretion of the district court." *Queen*

*City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 444 (3d Cir.1997).  The Court of Appeals

for the Third Circuit has held that, where all federal claims are dismissed before trial, "the

district court must decline to decide the pendent state claims unless considerations of judicial

economy, convenience, and fairness to the parties provide an affirmative justification for doing

so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).

In this case, only plaintiff's state law defamation claim remains pending before the court.

There is no federal interest in deciding this claim, and judicial economy, convenience, and

fairness are not served by this court, instead of the state court, resolving this case.  Neither party

will be significantly prejudiced by a dismissal of the defamation claim without prejudice,

because Pennsylvania has enacted a "savings statute," 42 PA. CONS. STAT. § 5103, pursuant to

which plaintiffs are permitted to file a certified transcript of federal proceedings in a state court

and "the date of institution of the federal suit [serves] as the state court filing date for statute of

limitations purposes, thereby obviating any limitations problems caused by dismissal." *Rashid v.*

*Kite*, 957 F. Supp. 70, 75 (E.D. Pa. 1997); *see Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d

Cir.1982).  If plaintiff chooses to pursue his state law claim in state court, that court will have the

benefit of this opinion, and of the extensive summary judgment filings already prepared by the

parties with respect to the state claims, should it choose to proceed directly to determining

whether the case can be decided as a matter of law.  Should there be issues that require

determination by a factfinder, there is no interest in this federal court conducting a trial on

exclusively state-law claims.

**V. Conclusion**

Based upon the foregoing discussion, defendants' motion for summary judgment will be granted with respect to plaintiff's federal claims at Counts I and III of the Third Amended Complaint and denied with respect to plaintiff's defamation claim at Count II. Plaintiff's state law defamation claim will be dismissed without prejudice so that plaintiff may pursue that claim, if he so chooses, in state court.

An appropriate order follows.


By the court,

Dated:  February 19, 2016                         _/s/ Joy Flowers Conti_
                                                  Joy Flowers Conti
                                                  Chief United States District Judge